EARL EDWARDS, Judge ad hoc.
This suit is by the plaintiff, against its own insurer, claiming the sum of ONE HUNDRED FORTY-THOUSAND, SIX HUNDRED FIFTY-SIX AND 17/100 ($140,656.17) DOLLARS, plus interest, attorney’s fees and costs. Plaintiff is engaged in the production and exploration of oil, gas and other minerals. Defendants issued an insurance policy to plaintiff, which, among other things, provided as follows:
“3. COVERAGE: To cover expenses entailed by the assured in regaining control of oil or gas wells being drilled —which get out of control as a direct result of the drilling of the wells insured hereunder until completion of abandonment as set forth in Paragraph 6 of this form, caused by * * * blowout and/or cratering.”
The word “of” between completion and abandonment, was no doubt intended to be “or.”
There was a deductible clause of FIVE THOUSAND AND No/100 ($5,000.00) DOLLARS, from any adjusted claim or loss. The basis of the suit is an alleged “blowout” in a well being drilled by plaintiff in St. Landry Parish, Louisiana, on July 20, 1958. The well was identified as the A. Courville #1, and was insured under the above-quoted insuring agreement of the insurance policy issued by defendants to plaintiff.
After a lengthy trial (over 800 pages of recorded testimony) the trial judge gave judgment to plaintiff in the sum of SIXTY-NINE THOUSAND, SIX HUNDRED TWENTY-FOUR AND 74/100 ($69,624.-74) DOLLARS. The defendants have appealed from this judgment and the plaintiff has answered the appeal, asking for an increase of the judgment to the sum originally prayed for, plus interest, penalties and attorney’s fees.
The essential facts of the case are, more or less, admitted and not disputed. The sole question is, was there a loss of control of this well as a result of a blowout? The petition alleged that the blowout occurred about 1:00 P.M., July 20, 1958; thereafter it alleges, the said blowout was intermittently under control and out of control until August 17th, 1958, where the hole or well was plugged and abandoned.
The words “blowout” and “control” are not defined in the insurance policy aforementioned.
The material facts relative to this case appear to be as follows:
On June 26, 1958, the well was spudded in. A 12J4" surface hole was drilled to 1849 feet, and 9%" outside diameter surface casing was cemented at 1821 feet. Two 10” Series #900 or #1500' Cameron QRC blowout preventers complete with usual drilling spool and choke manifold assembly were nippled up onto the surface casing. The surface casing and blowout preventer assembly were tested to 1000 pounds per square inch, prior to drilling ahead below the surface casing.
The crew began drilling an 8)4" hole below the surface casing on June 29, 1958. On July 11, 1958, while drilling at approximately 9465 feet, the crew experienced a salt water flow which necessitated raising the mud weight from 10.5 pounds per gallon to 11.6 pounds per gallon, and on July 12, 1958, the crew converted the mud sys *384 tem over from a native type mud to a lime base mud.
On July 20, 1958, at about 1:00 P.M., the crew drilled a break in about ten minutes from 10,000 feet to 10,005 feet, and the driller, Gregrich, instructed the derrick man to check the mud. The derrick man instantly reported back that the mud pits were running over. Gregrich, left the preventers open, •continued circulating the well without restricting its flow, and attempted to weight up the mud system as rapidly as possible. He then telephoned his tool pusher, Hughes, who was at his home and absent from the well-side, and who, in turn, called Mr. Kelly, president of Atlas Drilling Company. Mr. Kelly arrived shortly upon the scene to find some mud flowing onto the rotary floor and out of the mud pits. Quickly he closed the blowout preventers and shut in the well completely while a volume •of heavier weight mud was mixed in the surface pits. The drill pipe became stuck approximately fifteen minutes after the preventers were closed.
After a suitable volume of heavier mud was mixed in the surface system, circulation of the well was resumed, with the blowout preventers closed and returns from the casing annulus controlled by Y§" and l/z' chokes in the blowout preventer choke' manifold. The blowout preventer rams were opened at 4:30 A.M. on July 21, 1958, and the well was circulated without restriction of the annulus.
On the evening tour of July 21, 1958, fishing operations to recover the stuck drill pipe were commenced and continued until July 31, 1958. During these ten days the crews experienced gas cut mud on several occasions, and according to some witnesses closed the blowout preventers and circulated and conditioned mud several times. However, neither the drilling reports nor the job tickets made out by the .fishing tool man on the job contain any reference to the closing of the blowout preventers, or to the fact that the well blew out or was out of control. The fishing job was abandoned due to the inability of the crew to recover the pipe economically.
After the fishing job was abandoned on July 31, 1958, a cement plug was set above the fish in the original hole from 6,000 feet to 6,175 feet. This plug failed to set properly and a second plug was set at 6,000 feet to 6,175 feet on August 1, 1958. This second plug was satisfactory and whipstocking operations to sidetrack the hole were started from this plug. A piece of whipstock-ing tool was broken off in the hole, however, and upon the crew’s inability to recover same, a third plug for whip-stocking operations was set above the second plug at 5,966 feet to 6,120 feet. The well was successfully sidetracked off this plug and the crews drilled in the sidetracked hole down to 6,918 feet on August 10, 1958. During this ten-day period from July 31, 1958 to August 10, 1958, witnesses testified that the crews continued to experience gas cut mud, and that a crew had to close the preventers on at least one occasion to circulate and condition mud. However, the drilling reports make no reference to the closing of the blowout preventers or to any unusual well or mud troubles.
During the evening tour of August 1, 1958, after the sidetracked hole had been drilled to 6,918 feet, the mud returns were cut from 12.9 pounds to 12.2 pounds per gallon. Gas-cut returns continued to be experienced on August 11, 1958, the day tour drilling report containing a notation that the mud was gas-cut from 13.7 pounds to 12.4 pounds. A twenty-barrel slug of 20 pounds per gallon mud was mixed and displaced to the bottom of the hole by Halliburton Oil Well Cementing Company, after which the bit was *385 picked up to approximately 6,000 feet and into the original hole hy pulling out. 10 stands of drill pipe.
Circulation and conditioning of the mud in the hole was continued through the day tour of August 12, 1958, when the mud was being cut from 13.9 pounds to 13.7 pounds. A cement plug was set on the evening tour of August 12 at approximately 6,000 feet, after which 20 stands of pipe were pulled out of the hole, thus raising the bit to approximately 4,200 feet in the hole. The well continued to cut the mud weight, the evening tour drilling report for August 12, 1958 noting that the mud was gas-cut from 13.6 pounds to 13 pounds. Ten stands of drill pipe were run back into the hole at some subsequent time to place the bit at approximately 5,043 feet.
Circulating and conditioning of gas-cut and salt water-cut mud was continued until 8:00 A.M. on August 13, 1958, at which time the drill pipe became stuck and the crew unsuccessfully attempted to work it free for one hour. Then a cement plug was set at 4,563 feet to 5,043 feet, according to a Halliburton job ticket. No mention is made in the drilling reports of closing the blowout preventers during the period from August 10 to August 13.
During the evening tour of August 13, 1958, a free point indicator was run and the pipe was backed off at 1,810 feet. Fishing and washover operations to recover the stuck drill pipe were conducted until the end of the evening tour of August 1, 1958. The fish had been cleared out to 2,350 feet, and while the crew was washing over at 2,560 feet, it again encountered gas-cut mud. Efforts to overcome the pressure in the well with additional mud weight were not successful and a bradenhead squeeze cement job was performed on the well during the day tour of August 16, during which job 250 sacks of cement were squeezed down the drill pipe and out into the formation. A pressure test of the cement plug after six hours indicated that the cement had dropped out of the drill pipe and a second bradenhead squeeze job was performed with 250 sacks of cement. The plug was successfully pressure-tested and fishing operations were undertaken at approximately 9:00 A.M. on August 16, 1958. One joint of wash pipe was backed off and recovered, after which the hole was plugged and abandoned on August 17, 1958. Although some of the witnesses testified that from time to time the blowout preventers were closed during this latter period, no such notation is in the drilling reports.
This Court had no idea that there would be so much difference of opinion, based upon the above facts, as to whether a blowout did occur and whether there ever was a loss of control of the well by the operators. According to the experts who testified, there is no well accepted definition of the word “blowout” in the petroleum industry. We have been unable to find a Louisiana case in which the Court of Appeal or the Supreme Court defined the relative terms which are involved in this case. The Court’s attention was directed to several federal Court cases in which the terms were defined. Thus, in Central Manufacturer's Mutual Ins. Co. v. Elliott et al., 177 F.2d 1011, the United States Courts of Appeals, 10th circuit, in 1949, said :
“The term ‘blowout’ as used in oil operations has a technical meaning. It is generally defined as a condition in which a well builds up a sufficient gas pressure at the bottom of the hole and causes a rather sudden, forceful eruption or explosion which cleans out the well and causes it to go out of control.”
In Georgia Home Ins. Co. v. Means, 5 Cir., 186 F.2d 783, the Court said:
“ ‘The term “Blowout” shall be defined as a sudden expulsion of drilling fluid *386 (mud, water and sometimes oil) followed by an uncontrolled flow of oil, gas or water from an incompleted well that occurs when the pressure of oil, gas or water entering the hole at some depth is greater than the pressure exerted by a column of drilling fluid in the well.’ * * *
“As found by the court upon the undisputed evidence, there was a sudden expulsion of drilling fluid followed by an uncontrolled flow of oil, gas and water, in that the pressure of the gas entering the hole was, and, despite all efforts to prevent it, continued to be, greater than the pressure exerted by the heavy column of drilling fluid forced down into the well.”
In the case of Fidelity-Phenix Fire Insurance Company of New York v. Dyer, 220 F.2d 697, in a loss which occurred in Louisiana, decided by the 5th Circuit Court of Appeals, in 1955, there was a policy of insurance involved, and in that case, the term “blowout” was defined in the policy as follows:
“The term ‘blowout’ shall be defined as a sudden expulsion of drilling fluid not excluded otherwise by this policy, followed by an uncontrolled flow of oil, gas or water from the well that occurs when the pressure entering the well at some depth below the surface is greater than the pressure exerted by the column of drilling fluid in the well, resulting in the complete lack of control of the well or drilling operation.”
The Court pointed out the difficulty, of defining precisely, .the terms “blowout” and “kick” when efforts to do so by experts in the drilling of oil wells have not been able to define them. It pointed out that a “kick” is oftentimes the beginning of a “blowout” and if efforts to control a “kick” are not successful, the kick oftentimes develops into a blowout. The Court found that under the facts and the definition of the policy, there was a blowout which was com-pensable under the policy.
In the case of Equity Oil Co. v. National Fire Insurance Company of Hartford, 247 F.2d 393, decided in 1957 by the Tenth Circuit Court of Appeals, the question was presented to the Court, under a policy which excluded loss or damage “caused by or incident to a blowout.” The Court said:
“The policy did not define the term ‘blowout’, but it has come to have a reasonably well defined technical meaning in oil field operations and as used in insurance policies covering such operations. * * * We have abstractly defined the term as a ‘condition in which a well builds up sufficient gas pressure at the bottom of the hole and causes a rather sudden, forceful eruption or explosion which cleans out the well and causes it to go out of control’, * * * and, ‘as a condition in which a well builds up sufficient gas pressure at the bottom of the hole to overcome the hydrostatic weight in the well, and forces its way to the ground surface.’ ”
The above are the definitions accepted by the Courts and on the basis of such definitions, cases similar to the one now before the Court, have been decided. The Court could quote the various definitions advanced by the experts who testified in this case. There is no unanimity of opinion, among them, so no useful purpose would be served thereby. Similarly, it can be stated, there is no unanimity of opinion, even among the experts, as to whether or not the A. Courville #1 well was out of control at any time after July 20, 1958. The petition of plaintiff says “intermittently in and out of control” after that date. And even with the facts generally admitted, as above set forth, there are conflicts of opinions among the witnesses and throughout the eight hundred pages of recorded testimony as to whether there was a “blowout” and whether there was ever a loss of control over the well or not. One expert testified that even with the well abandoned and capped, in accordance with the State Conservation Department’s regulations, it was still out of control. His definition of *387 control was to be able to go back into the hole, to the deepest point penetrated, and to be able to resume operations from there; that if you could not do this, the well was not under control. The other extreme was that as long as the operator could close the “blowout preventers” at the top of the hole and thereby contain the subterranean pressures, that you had control of the well. Still others believe that you have a blowout and do not have control, when the subterranean pressures are forcing back the drilling fluids and muds into porous sand bodies between the bottom of the hole and the surface of the ground; that it was not necessary for the fluids to be necessarily emitted from the top of the hole and upon the surface of the ground or into the “slush pits.”
There were many varying opinions touching on the term “control” of this well. Again, the experts were not in accord on their interpretations of this term.
This Court has carefully considered the jurisprudence above cited, the facts in this case and a few basic principles toward sound logic and practicality. It likes the blowout definition in the cases of Central Manufacturer’s Mutual Insurance Company v. Elliott and Equity Oil Company v. National Fire Insurance Company, which are cited above. We emphasize that part of the definition of these cases which implies the necessity of a “sudden forceful eruption, which cleans out the well and causes it to go out of control.”
This Court is unwilling to coin or adopt a new and different definition. During oral argument, counsel for plaintiff was asked if he approved of said definitions, and the answer was “not altogether,” implying the necessity of some variation in the meaning of the term in order to apply it in this case. For the Court to adopt a new and different meaning to the term “blowout,” at this time, would only create confusion in the oil industry, as it relates to oil and gas exploration, and make equitable rating of rates by insurance companies almost impossible. The whims and thinking of Courts in different areas could not be anticipated with any certainty. In other words, this Court feels that, stability and progress for all concerned can be best served by adherence to the established definitions and policies, rather than by variations and changes of interpretations to fit peculiar situations.
To accept plaintiff’s views on the meaning of “blowout” and “control” makes it well nigh impossible to apply the insuring clause of the insurance contract to the facts herein. To state that there was intermittent control and loss of control between July 20, 1958 and August 17, 1958, would necessitate a conclusion that there were several or intermittent blowouts also. At what point in the procedures was there a loss of control and at what point it was regained, under the facts of this case, is so cloudy, vague or conjectural that the Court could not assess liability upon the insurer “for the expenses of regaining control,” with any degree of certainty. The trial Judge attempted to do this, and we note the inclusion of various items of expense in his award, which were patently erroneous, even if he had been correct in holding there was a blowout or were blowouts and loss of control, within the meaning of the policy.
For example, he allowed the entire bill of May Brothers, Inc., ($47,453.65) for mud and additives, and admittedly by plaintiff’s allegations and plaintiff’s witnesses, the well was under control while some of this mud was used; he allowed $536.86 for sales tax on lost drill pipe; too, he allowed, as expense, the work by Atlas Drilling Corp., for the entire period, July 22, 1958 to August 1, 1958, although the well was admittedly under control during a portion of that time.
On the other hand, if the Court applies the ruling of the Federal cases above cited * * * that there must be a sudden and forceful eruption, to the extent that the subterranean pressures clean out the hole *388 or well, and the accepted procedures of the trade, such as increasing the mud weights and/or closing the blowout preventers, cannot control or contain this subterranean force, then you do have a blowout. These other and lesser incidents, such as were present in this case, like a mild salt water flow, easily contained by increasing the mud weight or closing out the blowout prevent-ers, or a stuck drill pipe, are hazards which are often encountered in the drilling of wells in search of oil or gas. Indeed, it is difficult to imagine, where any new discovery well is brought in, that the operators would not have sudden and unexpected gas pockets, subterranean pressures or kicks, which would cause momentary or intermittent loss of control in the operations ; usually, by application of recognized accepted procedures, the operators regain or maintain their overall control from the top. To accept plaintiff’s argument, would be to make an insurer liable for numerous and uncertain claims arising out of times and conditions which the insurer could never duplicate or check.
In the interest of equity and fair play, and to stabilize the rights of the operator and the risks undertaken by the insurers, in this important industrial field, the Court feels that there should be a well defined line of demarkation as to what constitutes a blowout and what constitutes loss of control of a well.
Applying these principles here, the Court agrees with the experts who testified in behalf of the defendant insurers; it believes that the A. Courville #1 was at all times under control and that the incidents or happenings encountered by the plaintiff operators between July 20th and August 17th, 1958, did not constitute a blowout or blowouts within the contemplation of the insuring clause of the policy above quoted. The facts recited at the beginning of this opinion, show a continuity of control, between the above dates, on the part of the operator. This Court is unwilling to hold that the operator, in order to have control or regain control of the well, must reach the deepest point of penetration which had been reached prior to the occurrence complained of. Nor does it feel that a “wild well” is necessary in order to attach liability on the part of an insurer when the risks are as in this case. It does hold, however, in line with the above quoted cases * * * that the subterranean pressures must be sudden and forceful, sufficiently so to clean out the hole of drilling fluids and the uncontrolled flow of oil, gas and water is such that the operators, despite efforts and use of accepted means, procedures and safety devices known to the industry, are unable to restore circulation and to contain the pressures within the well.
A careful reading of this voluminous record, sustains the conclusion that there is a definite preponderance of evidence in favor of defendant-appellants. Its evidence is better, more logical and convincing in the light of the established jurisprudence.
We therefore conclude that the judgment of the trial Court should be reversed and that there should be judgment in favor of defendant-appellants, denying the demands of plaintiff-appellees, at their costs.
Reversed and rendered.
A. WILMOT DALFERES, J. ad hoc, dissents with written reasons.