HAWTHORNE, Justice.
 

 Creole Explorations, Inc., instituted this suit to recover its expenses in regaining control of an oil and gas well which allegedly got out of control because of a blowout. Plaintiff was the insured under a certificate of insurance issued by Underwriters at Lloyd’s, London, and recovery is claimed under the following provision:
 

 “To cover expenses entailed by the assured in regaining control of oil or gas well(s) being drilled * * * which get out of control as a direct result of the drilling of wells insured hereunder until completion of [or] abandonment * * *, caused by * * * Blowout * *
 

 Under this provision it will readily be seen that in order to recover plaintiff must establish (1) that there was a blowout, (2) that loss of control of the well was caused by such blowout, and (3) what expenses were incurred in regaining control.
 

 The district court awarded plaintiff a judgment of $69,624.74. The Court of Appeal reversed the judgment and dismissed plaintiff’s suit, being of the opinion that plaintiff had failed to establish that a blowout occurred. See La.App., 151 So.2d 382. On application of plaintiff we granted a writ of certiorari. 244 La. 477, 152 So.2d 565.
 

 According to plaintiff’s petition, the basis of -the suit is that one of its wells known as A. Courville No. 1 while being drilled
 
 *932
 
 blew out on July 20, 1958; that the well was intermittently under and out of control until August 17, 1958, when it was plugged and abandoned, and that more that $146,000.00 was expended during this period in an effort to regain control. The defense is that no blowout occurred, that control: of the well was never lost, and that therefore no expense was incurred by plaintiff to regain control.
 

 The well was spudded in by Atlas Drilling Company, drilling contractors, on June 26, 1958, and except for some saltwater difficulty on July 11, normal drilling conditions prevailed until July 20. On that day
 
 (July 20)
 
 the drilling was normal for the first six hours of the day tour which commenced at 7:00 a. m., and then at about 1:00 o’clock in the afternocn the driller Gregorich hit a break in the formation and drilled five feet in 10 minutes. Upon having the derrick man check the mud tanks Gregorich was informed that the tanks were running over. He ordered mud to be mixed and called the tool pusher Baltha Hughes, Jr., who was away from the well at the time. Hughes and Charles Kelley, president of Atlas, arrived at the well site quickly. Soon after Kelley’s arrival the mud was escaping over the bell nipple onto, the rig floor, and when this happened, he ordered the pipe picked up enough so that it could be rotated, and closed the blowout' preventers. Shortly after the blowout preventers were closed, the drill pipe became stuck in the hole. The blowout preventers remained closed until 4:30 a. m. on the 21st, when they were opened. In the interim the well had been “on choke”, and mud had been mixed to control it.
 

 Houston Oil Field Material Company’s fishing tool operators came on location on the 21st at about 3:00 p. m. to fish for the drilling pipe which had become stuck, and after a delay of seven hours began washing-over operations.
 
 [1]
 
 From then until July 31 fishing operations were performed every day, although they were stopped at times when the mud became so gas- or salt-cut that it had to be weighted up and conditioned in order for these operations to be continued.
 

 On July 31 a cement plug was set preparatory to whipstocking operations.
 
 [2]
 
 Because this plug did not hold, a second plug was necessary on August 1, and on this was set the whipstock tool. Whipstocking operations were commenced and were continued until some equipment was lost in the hole, and a new plug and a second whip-stock were set on August 5. Though interrupted by the gas- and saltwater-cut mud, drilling operations were continued to a depth of 6918 feet, when extreme pressures
 
 *934
 
 were encountered on August 10. On that date
 
 (August 10)
 
 the well again started blowing mud over the bell nipple, and drilling was stopped. From this time until the 17th, when it was finally plugged, the only operations ’at the well were mixing and conditioning mud; plugging the hole with cement and baroid to hold the pressure down in the hole, and fishing to recover stuck drill pipe and lost fishing tools from the well.
 

 It is important to state at this time that the certificate of insurance does not define the term “blowout”. Witnesses at the trial who were present on July 20 and on August 10 were of the view that the well blew out on these dates. The experts called by plaintiff were of the opinion that a blowout occurs whenever the pressures from the formation' overcome the hydrostatic pressure exerted by the mud column and force formation fluids to the surface. On the other hand, defendants’ experts were of the opinion that nothing less than a wild well is a blowout, and that as long as the blowout-preventing equipment performs its function of containing pressure within the well hole, no blowout occurs. Witnesses for both sides agreed that
 
 “blowout” is a loose term in the petroleum industry, and that no standard definition is recognised.
 

 The Court of Appeal apparently gave no weight to the testimony of the various expert witnesses in this case as to what a blowout is, evidently because there was no unanimity among them. The court reviewed cases where the meaning of the term “blowout” had been considered by several federal courts, and selected from these cases the meaning “it likes” the best, the definition given in Central Manufacturers’ Mut. Ins. Co. v. Elliott, 10 Cir., 177 F.2d 1011, as follows:
 

 “ * * * The term ‘blowout’ as used in oil operations has a technical meaning. It is generally defined as a condition in which a well builds up a sufficient gas pressure at the bottom of the hole and causes a rather sudden, forceful eruption or explosion which cleans out the well and causes it to go out of control.”
 

 Accepting this definition, the Court of Appeal concluded that plaintiff did not establish that a blowout had occurred in the well. We think the Court of Appeal erred in accepting this definition, for the court completely overlooked the well established legal principle for the interpretation of insurance contracts, that when more than one interpretation is possible, the one favoring the insured will be adopted. Finley v. Massachusetts Mut. Life Ins. Co., 172 La. 477, 134 So. 399; Ardoin v. Great Southern Life Ins. Co., 186 La. 583, 173 So. 112; Albritton v. Fireman’s Fund Ins. Co., 224 La. 522, 70 So.2d 111; Jones v. Standard Life and Accident Ins. Co. (La.App.), 115 So.2d 630.
 

 
 *936
 
 Regardless of what definition may have' heen given of the term “blowout” by the federal court, we think this rule of interpretation of insurance contracts is controlling here, and we shall adopt the definition of “blowout” most favorable to the insured in this case, that is:
 

 “A blowout occurs whenever the pressure from the formation overcomes the hydrostatic pressure exerted by the mud column and forces formation fluids to the surface.”
 

 Under this definition plaintiff here has •established to our satisfaction that the well being drilled blew out on
 
 July 20
 
 and again on
 
 August 10.
 

 The next question is: Was control of the well lost as a direct result of these two blowouts? Like “blowout”, the term “control” is not defined in the certificate of insurance, and the same rule of interpretation of insurance contracts governs this phase •of the case.
 

 Plaintiff and defendants are far apart in their theories of what “control” means. Defendants-respondents contend that the well was never out of control, making their •definition of “control” conform with their definition of “blowout”. In other word.s, under their theory there is always control unless the well is blowing wild. Having rejected their definition of “blowout”, we must also reject their theory of “control”. Plaintiff-relator, on the other hand, takes the position that the well was out of control from the time it blew out on July 20 either until the drilling depth of 10,005 feet of that date should be regained (which depth was never regained) or until the well was abandoned at a lesser depth on August 17. Plaintiff’s view is also not acceptable. Its own witnesses and those working in the oil industry admitted that a well had to be in control for drilling, fishing operations, washing-over operations, whipstocking operations, etc., to be performed; and many such operations were conducted in this well after July 20.
 

 The definition of “control” most favorable to the insured that is sensible and accords with the preponderant view of its own witnesses is that the well was under control when the column of mud was balanced so that whatever operations were necessary could be performed in the well bore hole, and that it was out of control when the mud column became so imbalanced from gas and saltwater penetrations that operations had to be stopped while the mud was conditioned or weighted up and control regained.
 

 The drilling report
 
 [3]
 
 and the testimony of numerous witnesses show conclusively that the well went out of control during the day tour of July 20, according to this meaning of the term “control”. Plaintiff’s own wit
 
 *938
 
 nesses testified that control of this well was regained on July 21,
 
 [4]
 
 They differed, how■ever, as to whether control was regained in the morning tour or in the evening tour ; hut the testimony when considered with the drilling report shows that control was regained during the evening tour of that ■date.
 

 Although witnesses for the plaintiff who were engaged from July 21 to August 10 in whipstocking or fishing or other operations at the well, which require control for their performance, testified that these operations had to be stopped at times in order for the mud weight to be built up, thus supporting plaintiff’s contention of intermittent loss ■of control, we cannot say from the evidence adduced when or how often this loss ■of control occurred <pr how much time was ■devoted to weighting up the mud system. The evidence is too vague and uncertain for us to find specific periods of loss of control from July 21 to August 10.
 

 On' August 10, when the well started blowing mud over the bell nipple and drilling was stopped, the chloride count in parts per million increased from 6700 to •33,000, and by August 13 reached 86,000, the highest Charles V. Hoosier, expert mud ■engineer, had even seen on a well where salt was not added deliberately. This witness testified that in South Louisiana the chloride count is rarely more than 1500 parts per million, and that a high count is indicative of a saltwater flow; that this high chloride count indicated that the hydrostatic pressure of the drilling fluids was insufficient to prevent an invasion of salt water into the well bore. The drilling reports and the testimony of the tool pusher Smithey, the drillers, the mud engineers, and others show that the activities at the well from August 10 until it was finally plugged were directed mainly at conditioning mud and setting plugs to keep the well from going wild. Employees of the Houston Oil Field Material Company testified that the condition of the well became so bad on the 16th that although it was beyond their required duties, they pitched in and helped mix mud. Under all these circumstances we find that the well was out of control for the major portion of the time from August 10 through August 16.
 

 The next question is: What expenses has the plaintiff established it incurred in regaining control of the well following the blowout of July 20 and in regaining control following the blowout of August 10?
 
 [5]
 

 In a supplemental and amended petition plaintiff listed its expenses in regaining control of the well as follows:
 

 
 *940
 
 Atlas Drilling Corporation $ 69,171.10.
 

 Creole Productions, Inc. 3,200.00
 

 Emar Guillory 703.92
 

 Gulfcoast Premix Mud Service 530.40
 

 Halliburton Oil Well Cementing Co. 5,026.17
 

 Houston Oil Field Material Co., Inc. 17,817.36
 

 Hub City Contractors 120.00
 

 May Brothers, Inc. 47,453.65
 

 Creole Explorations, Inc. 2,817.34
 

 $146,839.94
 

 The trial court disallowed the Creole Productions and Creole Explorations items, which were for the services and expenses of Creole’s field supervisor and for telephone calls; the Emar Guillory expense, which was for Diesel fuel used to loosen the stuck pipe; and the Houston Oil Fields Material Company’s expense, which was for fishing operations. All of these expenses had nothing to do with regaining control of the well, and hence were properly disallowed.
 

 The Atlas Drilling Company expense claimed represents the following items:
 

 Material (pipe collars, bits) lost in hole and not recovered $ 47,082.79 •
 

 Sales tax on pipes and bits 536.86
 

 Damage to blowout preventers 169.78
 

 Extra labor to mix mud, 7/21, 22 520.00
 

 Extra labor to mix mud, 8/10, 12, 13, 16 1,596.00
 

 Day work 7/20-8/17 26,214.55
 
 [6]
 

 The trial judge properly disallowed the-amount claimed for materials lost in the-hole, as this is not an expense recoverable-under the very terms of the insurance policy even though it may have been a loss, due to the blowout. Since this claim will' be disallowed, it follows that the item of sales tax on the lost materials will likewise be disallowed. The item of damage to the blowout preventer will also be disallowed since this loss was a loss caused by efforts, to keep the pipe from getting stuck and was not an expense to regain control of the well within the meaning of the policy.Consequently the first three items listed in the Atlas Drilling expense will be rejected as they were not expenses in regaining control.
 

 The item of $520.00 for extra labor to-mix mud on July 21 and 22 following the-blowout on July 20 is clearly an expense to-regain control of the well and will be allowed.
 
 [7]
 
 The same is true of the it.em of extra labor to mix mud on August 10, 12,, 13, and 16, amounting to $1596.00.
 
 [8]
 

 The Atlas expense for day work from-July 20 to August 17 has not been proved in the amount claimed. As we have previously pointed out, the evidence does not establish with any degree of certainty the times when the well was out of control.
 
 *942
 
 from July 21 until August 10, and under these circumstances the plaintiff is not entitled to recover for any day labor performed between these dates.
 

 Plaintiff, however, is entitled to recover the expense for day work on July 20 and 21 and from August 10 through August 16 where the expense of such day work was incurred in regaining control of the well. Atlas has charged the plaintiff with 34 hours of day work on July 20 and 21 and 168 hours from August 10 through August 16,
 
 [9]
 
 or a total of 202 hours. All of these hours of work, as shown by the “Description of Work” attached to the invoices, were not hours devoted to regaining control ■of the well; some of them were for making trips, conducting fishing operations, performing work in the bore hole, etc. Accordingly this expense for labor cannot be. computed on the basis of the descriptions in the billing by Atlas, but can be computed ■only on the basis of evidence that clearly differentiates the time for conditioning mud, building up mud volume, and fighting blowout (all operations directed toward regaining control) from that devoted to the ■other operations such as fishing and whip-stocking. The drilling reports
 
 [10]
 
 appear to be the only source of this kind of information, so on the basis of the time that appears there (except insofar as it is decreased by other evidence of plaintiff conflicting with it), we find the following hours of day time were actually devoted to regaining control of the well:
 

 July 20 10 hours
 

 July 21 21 hours
 

 August 10 7)4 hours
 

 August 11 20 hours
 

 August 12 22)4 hours
 

 August 13 13)4 hours
 

 August 14 3)4 hours
 

 August 16 8 hours
 

 Total 106 hours
 

 Computing this day time, or day work, at $925.00 per day, or $38.5416 per hour, charged by Atlas, we have 106 hours at $38.5416, or $4085.41, which plaintiff is entitled to recover.
 

 In sum, the Atlas items claimed which plaintiff is entitled to recover are therefore:
 

 Extra labor to mix mud 7/21, 22 $ 520.00
 

 Extra labor to mix mud 8/10,12, 13, 16 1596.00
 

 Day work 7/21-22, 8/10-16 4085.41, or a total of $6201.41.
 

 The Halliburton Oil Well Cementing Company expense of $5026.17 was reduced by the district judge, and properly, by $593.79, which represented the cost of plugging the well on August 17 to conform with Conservation Department standards and was not an expense in regaining con
 
 *944
 
 trol. In addition, the Halliburton expense claimed should be reduced by $2137.75, the amount included as expense of setting plugs for whipstocking operations on July 31 and August 1, 5, and 13 (defendants in supplemental brief here do not calculate work on the 13th as whipstocking plug, but the invoice clearly shows it was, and Gondran, a cement operator, testified it was).
 
 [11]
 
 Plaintiff can therefore recover on the Halliburton claim only the expense of the plugs set to control the pressure — baroid plug on August 11, $388.50;
 
 [12]
 
 cement plug on August 12, $501.65;
 
 [13]
 
 cement plug on August 16, $1404.48
 
 [14]
 
 — , or a total amount on. the Halliburton claim of $2294.63.
 

 The Gulfcoast Premix Mud Service expense of $530.40 for extra mud on July 21 and the Hub City Contractors expense of $120.00 for extra labor to mix mud on July 22 are clearly expenses of regaining control,
 
 [15]
 
 and defendants admit these expenses in supplemental brief here.
 

 The May Brothers, Inc., account is for mud and additives delivered to the well. As shown by our discussion of the other expenses incurred, plaintiff is entitled to recover on this claim only the cost of the mud and additives used to regain control following the blowout of July 20 and to regain control following the blowout of August 10.
 

 May Brothers’ invoices for mud and additives delivered to the well on July 20 and 21 and on August 13, 14, and 15
 
 [16]
 
 show a total cost of $46,845.50. The record is unclear, however, as to what portion of the mud and additives was put into the well for the purpose of regaining control, and what portion was used for the purpose of maintaining control or in normal operations from July 21 to August 10 or in other operations from August 10 through August 16 (during this latter period the well, as already stated, was intermittently in and out of control but out of control for the greater portion of the time). It appears to us, however, that a large portion of these materials was used to regain control of the well, but what amount was used and what the cost was we are unable to determine from the condition of the record. It is certain, however, that plaintiff is entitled to recover the cost of the mud and additives used to regain control of the well if it can prove with any degree of certainty the expense to it for such portion of the mud and additives. Therefore, in the interests of justice, we shall remand the case to permit plaintiff to prove, it if can, the cost of mud
 
 *946
 
 and additives used to regain control of the ■well.
 

 To recapitulate, plaintiff is entitled to recover the following as expenses of regaining control of the well:
 

 Atlas Drilling Company $6201.41
 

 Halliburton Oil Well Cementing Company 2294.63
 

 Gulfcoast Premix Mud Service 530.40
 

 Hub City Contractors 120.00
 

 Total-.---------$9146.44
 

 On the remand the trial judge will accordingly award to plaintiff a judgment for $9146.44, plus any additional amount found to be due for mud and additives used to regain control of the well.
 

 It is the contention of defendants-re■spondents that they are entitled to a reduction of $5000.00 from any amount that may be found to be due plaintiff, under the following provision of the certificate of insurance :
 

 “A. DEDUCTIBLE CLAUSE: It is •understood and agreed that there shall be deducted the sum of $5,000.00 from any
 
 •adjusted claim
 
 hereunder.” (Italics ours.)
 

 In insurance matters adjustment of ■claims is generally considered as a process between insurer and insured whereby the amount or value of a loss by the insured is ascertained. It is not the process by which the courts ascertain the amount of the loss, as shown by discussions devoted to the adjustment process in the major works on insurance. Mowbray and Blanchard, Insurance, Its Theory and Practice in' the United States (5th ed. 1961), p. 440 ; 6 Appleman, Insurance Law and Practice; Ch. 170, “Adjustment, Compromise and Settlement”, pp. 412 et seq.; 7 Cooley’s Briefs on Insurance (2d ed.), Ch. XXVI, “Adjustment ,of Loss”, pp. 6108 et seq.; Reed, Adjustment of Property Losses (2d ed. 1953), pp. 2, 3.
 

 In the instant case there has been no adjusted claim because there were no negotiations between insured and insurer fixing the amount due the insured. On the contrary, the insurer denied any liability whatever, and thus there was no occasion for the adjustment process, or fixing the amount of the loss under the policy. The amount of loss under the policy is being fixed by judicial process in this instance, and not by adjustment process. Consequently the claim of the defendants for the $5000.00 deduction will be denied.
 

 In rendering judgment in favor of plaintiff the district court named as one of the defendants the Southern Marine & Aviation Underwriters, Inc. This was error, for this corporation has no liability under the certificate of insurance, according to the following provision of the certificate:
 

 
 *948
 
 “It is expressly understood and agreed by the Assured by accepting this instrument that neither Southern Marine & Aviation Underwriters, Inc., * * * nor Messers Mendes & Mount, Attorneys, is an Assurer hereunder and that neither is or shall be in any way or to any extent liable for any loss or claim whatever, but that the Assurers hereunder are those Underwriters, whose names are on file as hereinbefore set forth.”
 

 ' The district court shall therefore render judgment on the remand dismissing this defendant from the suit.
 

 Plaintiff contends that it is entitled to penalties and attorney’s fees. As we view the matter, there was sufficient doubt that the loss was covered by this certificate of insurance so that we cannot say that defendants have acted arbitrarily, capriciously, and without probable cause in denying liability. Consequently plaintiff’s, claim for penalties and attorney’s fees will be denied, and the district court on the' remand shall so order.
 

 For the reasons assigned this case is-remanded to the Civil District Court for the Parish of Orleans to be proceeded with in accordance with the views here expressed. Assessment of costs is to await the final determination of the cause.
 

 HAMITER, J,, is recused.
 

 [1]
 

 . “Washing over” is the name given to the efforts to loosen the stuck drill pipe.
 

 [2]
 

 . “Whipstocking” means operations to deviate from and sidetrack the original drilling hole.
 

 [3]
 

 . Atlas Exhibit No. 2.
 

 [4]
 

 . Testimony of Mr. Kelley, president of Atlas Drilling Company, tr. p. 98; testimony of Mr. Baltha Hughes, Jr., tool pusher for Atlas, tr. p. 195; deposition of Mr. Harry Bryan, vice-president' of plaintiff Creole Explorations, Inc., Defendants’ Exhibit No. 1.
 

 [5]
 

 . No drilling was conducted after August 10, and the' well was abandoned on August 17. .......
 

 [6]
 

 .These items actually total $76,119.92, more than the Atlas claim.
 

 [7]
 

 . Atlas Exhibit No. 8.
 

 [8]
 

 . Atlas Exhibit No. 9.
 

 [9]
 

 . Atlas Exhibits Nos. 14 and 13.
 

 [10]
 

 . Atlas Exhibit No. 2.
 

 [11]
 

 . Exhibits Hall. Nos, 16, 17, 14, 15, 9, 10, 5, and 6.
 

 [12]
 

 .
 
 Hall. Exhibit No, X.
 

 [13]
 

 . Exhibits Hall. Nos. 7 and 8.
 

 [14]
 

 . Exhibits Hall. Nos. 3 and 4.
 

 [15]
 

 . Exhibits Gulfcoast No. 1 and Hub No. 1.
 

 [16]
 

 . Exhibits May Nos. 2, 3, 5, 6, and 7.