HOOD, Judge.
This is an action by Mrs. Burdiel Jean Hebert to recover the amount alleged to be due under a group life insurance policy. The policy was issued by defendant, Tennessee Life Insurance Company, to Reading & Bates Offshore Drilling Company, insuring the lives of the employees of the drilling company. Plaintiff is the widow of Wilfred Trahan, deceased. She alleges that her husband, as an employee of Reading & Bates, was an insured under the above mentioned policy at the time of his death, and that she is his named beneficiary. Judgment was rendered by the trial court in favor of plaintiff. Defendant has appealed.
The principal issue presented is whether Trahan’s coverage as an insured under the group life insurance policy had been terminated prior to his death. In order to resolve that issue it is necessary to determine whether Trahan’s employment by Reading & Bates was completely “terminated” on July 4, 1966, or whether he received only a “temporary lay-off” on that date.
Trahan began working for Reading & Bates as a roughneck on an offshore drilling rig, in October, 1964. While so employed he was included as an insured under the above mentioned group life insurance policy which previously had been issued by defendant to the drilling company.
On or shortly before July 4, 1966, while Trahan was working for his employer on an offshore rig, he had an argument with Joe Ceramie, the “tool pusher” on that rig, and during the course of that argument the tool pusher informed Trahan that he was “fired.” The tool pusher was Trahan’s immediate superior at that time. Trahan left the rig by boat with other members of the crew on July 4, 1966, and he has not performed any work for Reading & Bates since that date.
About three days after Trahan left that rig, he complained to Leo Clark, the Drilling Superintendent for Reading & Bates, that he had been treated unfairly by Ceramie. Clark volunteered to talk to the tool pusher about it, and after doing so he informed Trahan that the latter could return to work for the company as soon as there was an opening for him on another rig. Trahan consented to do that.
Clark and Trahan also agreed at that time that Trahan could work for another employer temporarily while he was waiting for an opening at Reading & Bates, and Trahan did work for another employer for a few days. On August 9, 1966, Trahan advised Clark that he had completed his “hitch” with the other employer, and Clark thereupon gave Trahan an employment slip reciting that the latter was employed by Reading & Bates on that day, August 9, 1966. He instructed Trahan to report for work at the “JWB” rig, that being a different rig from the one on which Ceramie worked. Trahan requested that he be allowed a few days within which to move his family into another home, and in view of that request the parties agreed that Trahan was to report to the rig for work on August 14, 1966.
On August 11, 1966, which was two days after Trahan received the employment slip but three days before he was scheduled to report for work, he was killed in an automobile accident.
The group life insurance policy which had been issued by defendant to Reading & Bates contains the following provision:
“TERMINATION OF INDIVIDUAL INSURANCE. The insurance as to any individual Employee hereunder shall cease thirty-one days after termination of his employment with the Employer, or at the written request of the Employee filed with the Company through the Owner, except as otherwise provided in this Group Policy.” (Emphasis added.)
*81 Attached to and made a part of that policy is an endorsement which provides:
“Temporary Lay-Off or Leave of Absence. The Group Life and Accidental Death and Dismemberment Insurance set forth in this Master Policy will not remain in effect beyond the last day of the calendar month next following the calendar month in which the lay-off or leave of absence begins.” (Emphasis added.)
It is apparent from these provisions that if Trahan’s employment was “terminated" on July 4, 1966, then he ceased to be an insured under the policy 31 days later, or on August 4, 1966, and thus plaintiff would not be entitled to recover, because her husband’s death would have occurred after the policy ceased to apply to him. On the other hand, if Trahan received only a “temporary lay-off‘ on July 4, 1966, then the policy remained in effect as to him until the last day of the next month, or until August 31, 1966. And, in that case plaintiff would be entitled to recover since her husband’s death would have occurred while the policy was still in effect. It is important to determine, therefore, whether Trahan’s employment was “terminated” on July 4, 1966, or whether he received a “temporary lay-off” on that date.
The evidence consisted principally of the testimony of Leo Clark, Drilling Superintendent for Reading & Bates, and of various documents, including time sheets, employment slips and copies of cancelled checks. Neither the tool pusher, Ceramie, nor anyone else who was present when Trahan was “fired” testified at the trial, and the evidence as to what transpired on that occasion, or as to when the firing occurred, is not clear.
The time sheets and the employment slips (designated as “employee’s records”) indicate that the tool pusher told Trahan that he was fired on June 28, but that the latter continued to work until July 4, 1966, when the entire crew was changed and all of them, including Trahan, were transported from the rig by boat. Ceramie noted on Trahan’s time sheet, “6-28-66 Could not get along. Final check.” Substantially the same notation appears on one of the employment slips, except that it indicates that Trahan left the employment on June 28, 1966. Ceramie also had someone make a notation on Trahan’s personnel record, “Do not rehire.” The evidence, including the time sheets which were produced, show that Trahan worked every day from June 28 until July 4, 1966.
Reading & Bates were operating at least ten off-shore rigs at that time, with Ceramie being employed as the tool pusher on one of them. Clark, as the Drilling Superintendent, was in charge of the entire gulf coast area for that company, and he was superior in authority to all tool pushers, including Ceramie. Clark, in fact, hires the tool pushers for each of the various rigs which are operated by the company. Prior to 1966 Clark also hired all employees who worked on those rigs. The company engaged a personnel manager in 1965, however, and that officer now engages most of the employees although Clark himself still hires the tool pushers and he has authority to employ anyone else. The evidence indicates that the tool pusher, Ceramie, did not have authority to do any hiring.
The evidence is vague as to whether Ceramie had authority to “fire” or to “terminate” Trahan’s employment. With reference to the tool pusher’s right to fire an employee, Clark testified that, “He’s running the rigs. If he’s fired, he’s fired.” On the other hand, Clark made it clear in his testimony that he did not consider Trahan’s employment by Reading & Bates to have been terminated completely when Ceramie fired him. He testified that “You don’t have any intentions (as to whether the employment has been terminated until you get both sides of the story,” that after getting both sides of the story in this instance he found that “it was just a personal difference between two men,” that it did not necessarily have anything to do with *82 Reading & Bates, and that there was no intention “that Trahan would never work for Reading & Bates again.” He stated that in reference to Ceramie, “if he doesn’t want him rehired, if he doesn’t want him back on his rig, you don’t put him back on his rig,” but that he never intended “to permanently fire Wilfred Trahan,” and that he merely planned to assign him to another Reading & Bates rig as soon as he had an opening. He expected to have an opening for Trahan on another rig the following month, in August.
According to Clark, employees who were “temporarily laid off,” and who remained out of work for thirty days or more, were required to have an employment slip before returning to the job. A person cannot be put to work by the tool pusher without such a slip, and the employment slip is issued by the Drilling Superintendent or by the personnel officer. The procedure used in this case, that is the issuance of an employment slip to Trahan on August 9, 1966, was the procedure which was customarily used when an employee is returned to work after being “temporarily laid off” for at least thirty days, or after his employment was terminated.
The evidence convinces us that the tool pusher, Ceramie, did not have authority to completely terminate Trahan’s employment by Reading & Bates. That authority was vested in the Drilling Superintendent or in his superiors. As a matter of company policy, the tool pusher could refuse to allow Trahan to work on a rig or in a crew which came under his immediate supervision, but even by company policy or custom he could not prevent the company from assigning Trahan to some other rig or crew. The evidence indicates to us that all Ceramie wanted to do was to get Trahan off his rig. Even when he had the notation “Do not rehire” made on Trahan’s records, we think he meant that he did not want Trahan rehired to work under his supervision. When Clark discussed the matter with Ceramie, for instance, the latter agreed that it was all right for Trahan to work on other rigs, but that he did not want him back on a crew working with Ceramie. And, Clark apparently felt that he was acting in complete accord with Ceramie’s wishes when he assigned Trahan to another Reading & Bates rig.
Legal agreements have the effect of law upon the parties, and the intent of the parties is to be determined by the words of the contract, where these words are clear and explicit and lead to no absurd consequences. LSA-C.C. art. 1945.
The insurance contract involved in the instant suit does not specifically define “termination” and “temporary lay-off,” as those terms are used in the above quoted provisions of the policy. Those terms are frequently used interchangeably, and we realize that sometimes it is difficult to distinguish between them. However, the fact that the two terms are used in the policy, and an important distinction is made as to the legal effect of each, indicates that the parties to the contract intended for the terms to have different meanings.
Defendant has referred us to the cases of Peyton v. Metropolitan Life Ins. Co., 148 So. 721 (La.App.Orl.Cir.1933); Aetna Life Ins. Co. v. Carroll, 188 Ark. 154, 65 S.W.2d 25 (1933); Klym v. Aetna Life Ins. Co. of Hartford, Conn., 305 Mich. 508, 9 N.W.2d 693 (1943); Lineberger v. Security Life & Trust Company, 245 N.C. 166, 95 S.E.2d 501, 68 A.L.R.2d 1 (1956). We, however, do not find these cases to be persuasive. In Peyton, the evidence showed clearly that the employment had been formally and completely terminated five months before the death of the employee occurred, and the principal issue presented there was one involving estoppel. In Aetna Life Ins. Co. v. Carroll, supra, the “undisputed proof” showed that the employment had been formally terminated, and plaintiff failed to show that the premiums which had become due on the policy had been paid. The facts in the Klym case are similar to those presented here, although the issue was whether the decedent was or was not employed at the time of *83 his death. The evidence showed that the employment had been completely terminated. Entries to that effect had been made in the paymaster’s records, the decedent’s record plate was removed from the ad-dressograph file, his defense bonds were checked out, his insurance card was removed, and no deductions were made for insurance premiums after the date of his termination. The facts in that case, as well as the issues, thus were substantially different from those presented here. And, in Lineberger, supra, the facts also showed clearly that there had been a termination of the employment before the death of the employee. There, the Supreme Court of North Carolina said:
“It seems evident that the words ‘termination of his employment’ within the terms of the policy refer to the status of the employee rather than to a contractual relationship, and must mean a complete severance of the relationship of employer and employee, of which the employee has knowledge, by positive act on the part of either or both.”
The rule which we think should be applied here is stated in 68 A.L.R.2d, Sec. 23, p. 54, as follows:
“ * * * While it is not always possible to distinguish clearly between the discharge of an employee and a layoff of such employee, the distinction seems to be, theoretically speaking, that in the case of a discharge the employment has been definitely and permanently terminated with no intention on the part of the employer of rehiring the discharged employee, even in the case of need for more employees, while, in the case of a- layoff, there is a definite intention on the employer’s part to have the employee work for him at some later date when additional workers are needed.”
“A ‘layoff’ amounts to a termination of employment within the meaning of such a clause in a group policy where such layoff is intended as a permanent dissolution of the employer-employee relationship, while where a layoff is considered as a mere temporary interruption from work, with an intention of continuing such relationship, it does not constitute a termination of employment within the meaning of such a clause.”
In Peters v. Aetna Life Ins. Co. of Hartford, Conn., 279 Mich. 663, 273 N.W. 307 (1937), an issue similar to the one presented here was considered, and there the Supreme Court of Michigan appropriately said:
“It is evident that ‘termination of employment’ within the terms of the policy means something more than that the employee ceased to work and the employer to pay him. Such a situation ordinarily would exist in case of sickness, injury, layoff, or leave of absence, during which, by its express terms, the policy nevertheless continued in force. The clause must mean a complete severance of the relationship of employer and employee by positive act on the part of either or both. In the absence of conclusive evidence, the character of the cessation of work must be found from the attendant circumstances.”
Also applicable here is the rule that when more than one interpretation may logically be given to an insurance contract, the one favoring the insured will be adopted. LSA-C.C. arts. 1957 and 1958; Creole Explorations, Inc. v. Underwriters at Lloyd’s, London, 245 La. 927, 161 So.2d 768 (1964).
With the above mentioned rules in mind, we have concluded that Trahan’s employment was not terminated on July 4, 1966, but that instead he was “temporarily laid off” of work at that time. The group life insurance policy thus was still in effect as to him at the time of his death on August 11, 1966. The trial judge, therefore, correctly rendered judgment in favor of plaintiff.
*84 No question has been raised as to the amount of the award which was made by the trial court.
For the reasons herein set out, the judgment appealed from is affirmed. All costs of this appeal are assessed to defendant-appellant.
Affirmed.