305 So.2d 630 (1974)
PHILLIP ROSAMOND DRILLING COMPANY, INC., Plaintiff-Appellee,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant-Appellant.
No. 12481.
Court of Appeal of Louisiana, Second Circuit.
December 10, 1974.
*631 Davenport, Files & Kelly by Thomas W. Davenport, Jr., Monroe, for defendant-appellant.
Theus, Grisham, Davis & Leigh by Ronald L. Davis, Jr., Monroe, for plaintiff-appellee.
Before AYRES, PRICE and HALL, JJ.
PRICE, Judge.
Phillip Rosamond Drilling Company, Inc., brought this action against St. Paul Fire and Marine Insurance Company seeking to recover for the value of drill pipe and collars allegedly lost when a blowout occurred in a drilling operation undertaken *632 by plaintiff in LaSalle Parish. This equipment was insured under a scheduled floater policy issued by defendant to plaintiff insuring against damage or loss from specified perils.
In addition to the amount of the loss claimed, plaintiff demands penalties and attorney's fees for an alleged arbitrary and capricious refusal of defendant to pay its claim upon presentation of proof of loss.
Defendant denies the loss sustained comes within the policy definition of the perils insured against. After trial on the merits the district court awarded plaintiff judgment for the stipulated amount of the loss, $7,783.85, together with twenty-five percent of principal and interest as penalties, and attorney's fees of $1,750.00. From this judgment defendant suspensively appealed.
The circumstances and events which give rise to this litigation are not in dispute and are substantially as follows:
On or about August 9, 1971, plaintiff spudded in a well under a contract to drill to a depth of 2,950 feet. After reaching this depth on August 12, 1971, the drilling crew began removing the drill pipe to allow an electric log of the well to be made. After the drill bit had ascended to about 1,600 feet drilling mud began "kicking" over the bell nipple onto the platform of the rig. A safety valve was installed to permit closing of the well. The Kelly valve which had been removed to withdraw the drill pipe was replaced over the safety valve to allow drilling mud to be pumped through the drill pipe in an attempt to overcome the pressure of the gas entering the drilling hole. The pumping in of additional drilling mud to regain the hydrostatic pressure in the well was unsuccessful, requiring the closing of the blowout preventers on the well. A heavier drilling mud was circulated in the well to remove the gas which had cut the original drilling fluid. Pumping of the fluid produced approximately 600 pounds pressure on the pressure gauge on the rig floor. When pumping ceased the pressure dropped to zero and then climbed back to 200 pounds, indicating the pressure from within the well hole was greater than the hydrostatic pressure of the column of drilling fluid. A further attempt to overcome the well pressure was made by pumping in several hundred sacks of cement. Shortly thereafter the drilling superintendent felt the drill pipe in the hole quiver and ordered the crew to look around the well site for a surface blowout. They discovered the drilling mud and cement was surfacing in a creek located nearby.
A decision was made to lower the drill stem back to the bottom of the hole so that heavier mud or cement could be pumped to the bottom of the well. The Kelly valve was removed and a "stripper" was utilized to permit the drill pipe to be lowered back to the depth of 2,950 feet. Five hundred sacks of heavy mud were pumped to the bottom of the hole through the drill pipe. As the additional mud did not restore the hydrostatic pressure, a plastic substance designed to seal off the gas was pumped into the well. The mud and plastic were expelled from the well into the creek. Phillip Rosamond, President of the drilling company, decided it was necessary to kill the well. To accomplish this seven hundred fifty sacks of cement were pumped to the bottom of the hole. The drill pipe was then perforated at a depth of around 1,600 feet and additional cement was applied at this depth. By taking this action the drill pipe and collars were cemented in place, resulting in the loss which is the subject of plaintiff's claim against defendant.
Defendant does not deny the happening of these events, but contends the loss of the drill pipe and collars did not result from a "blowout" of the well as that term is defined in the policy of insurance.
The pertinent provisions of the policy are as follows:
"5. Perils covered:
* * * * * *
(f) Blowout or cratering (as hereinafter defined);

*633 * * * * * *
"10. General conditions:
* * * * * *
(b) Blowout and Cratering Definition:
The term `Blowout' shall be defined as a sudden expulsion of drilling fluid (mud, water and sometimes oil) followed by an uncontrolled flow of oil, gas or water from the well that occurs when the pressure of oil, gas or water entering the well at some depth below the surface is greater than the pressure exerted by the column of drilling fluid in well and resulting in the well getting completely out of control.
"The term `Crater' shall be defined as a basinlike opening in the earth's surface surrounding a well caused by the erosive and eruptive action of gas, oil or water flowing without restriction."
The principal thrust of defendant's argument is that it is the intent of the policy definition of a "blowout" for there to be an encounter with a pressurized gas or liquid while drilling, causing the sudden expulsion of the drilling fluid from the surface opening of the drilling shaft, resulting in the absolute and unrecoverable loss of control of the well. In essence, defendant relates the term "blowout" as defined in the policy to what is commonly called a "wild well", requiring highly specialized personnel and equipment to shut it in and involving a disastrous loss of drilling equipment. Defendant contends the circumstances encountered by plaintiff are merely adverse pressure conditions which, although preventing plaintiff from completing the well as a producer, are not within the meaning of the policy term "blowout".
Plaintiff contends the events shown by the evidence do constitute a "blowout" in accord with the policy definition and the usual understanding of this term in the oil industry. Plaintiff also cities and relies on the decision of the Louisiana Supreme Court in Creole Explorations, Inc. v. Underwriters at Lloyd's, 245 La. 927, 161 So. 2d 768 (1964).
The trial judge found the evidence sufficient to bring the loss within the policy definition of "blowout". We are of the opinion he was correct in his conclusion and affirm the judgment appealed from.
According to the testimony of the "tool pusher" on the well, John Brantley, the well "kicked" on August 12th. This was caused by the pressure of oil, gas or water entering the well at some depth below the surface being greater than the pressure exerted by the column of drilling fluid in the well. This started the series of events which led to a sudden expulsion of the drilling fluid from the well through a fracture in an underground strata. According to the testimony, this fracture probably occurred when the well was being circulated under pressure in an attempt to remove the trapped gas from the drilling fluid. From this point on there was an uncontrolled flow of the gas through this strata onto the surface in the creek bed until the well was killed by cementing it in.
We do not find the language of the policy defining "blowout" to require the expulsion of drilling fluid be from the surface opening on the drilling hole in an upward direction as contended by defendant. The policy merely provides there be "a sudden explusion of drilling fluid . . . from the well."
Nor can we agree with defendant's theory that the well was never completely out of control. This argument is based on the theory that plaintiff's crew was able to exert sufficient control over the well to run the drill stem back to the bottom of the hole prior to cementing the well in.
The testimony shows that at the time plaintiff made the decision to kill the well there was eminent danger of the well cratering, resulting in the loss of the entire drilling rig. It is undisputed that only because of the skillful and prompt actions of *634 plaintiff's crew was such an eventuality prevented.
We think a reasonable interpretation of the policy language requiring the well to be "completely out of control" is an adverse pressure and flow of gas or liquid from the well which cannot be corrected by injection of drilling mud or otherwise to allow the operator to continue normal drilling operations. There is no doubt this could not be accomplished in this case.
The only expert testimony in the record is given by Hugh G. McDonald, Jr., district engineer of the Department of Conservation, whose qualifications in this area are credible. He testified that a blowout had occurred in accord with his understanding of the meaning of this term within the oil industry. He was of the opinion the term "blowout" included an uncontrolled flow of gas or oil from the well through an underground strata following an encounter with an adverse pressure condition in the well. No expert testimony was offered by defendant to rebut this evidence.
Where the provisions of an insurance policy are susceptible of more than one interpretation, this court should accept the one most favorable to allow coverage to the insured. Creole Explorations, Inc. v. Underwriters at Lloyd's, supra. Viewing the circumstances presented in light of this rule, we must conclude the loss sustained was within the peril insured against.
The defendant contends the trial court was in error in awarding penalties and attorney's fees based on a finding the actions of its claims manager in denying the claim was arbitrary and capricious.
The evidence shows that immediately after notification of the incident an independent adjuster from Monroe was engaged by the defendant to investigate and report on the claim. After completing his investigation the adjuster recommended to the claims manager of the insurer the loss was covered and that it be paid. This official of defendant rejected payment based on his own interpretation of the policy provisions as they relate to the events known to have happened. The evidence shows he had little prior knowledge of the oil industry or drilling procedures and terminology. He testified he arrived at his conclusion without consultation with an expert in this field.
Under these circumstances it would appear his actions were arbitrary and the trial court's award of penalties and attorney's fees were appropriate.
For the foregoing reasons the judgment appealed from is affirmed at appellant's cost.