**ATLANTIC RICHFIELD CO.,**
**Plaintiff,**

**v.**

**UNDERWRITERS AT LLOYD'S**
**LONDON et al., Defendants.**

**Civ. A. No. 72–H–1638.**

United States District Court,
S. D. Texas,
Houston Division.

April 28, 1975.

Michael R. Waller, Houston, Tex. (Childs, Fortenbach, Beck & Guyton, Houston, Tex.), James R. Coffee, Dallas, Tex., for plaintiff.

Clarence A. Frost, New Orleans, La. (Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La.), Bass C. Wallace, Houston, Tex. (Andrews, Kurth, Campbell & Jones, Houston, Tex.), for defendants.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

An offshore gas well "blew out" on January 13, 1970. Plaintiff, the well owner, filed claims with the defendant

insurance underwriters under policies in force at the time to recover $262,613.19, which constituted the total expenses allegedly incurred by plaintiff to bring the well under control, in the amount of $1,262,613.19, less an applicable deductible of $1,000,000.00. On demand, the defendants refused to honor plaintiff's claim, and plaintiff has sued to recover this amount. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.

Plaintiff has moved for summary judgment. In their pleadings, both sides acknowledge that the case presents one central question: at what date was the well which "blew out" brought under control?[1] To plaintiff, this is a question of law; to defendants, this question is factual, and defendants additionally allege that the facts are in dispute as to when control was regained, and as to what expenses were properly incurred in bringing the well under control.

The Court has reviewed the extensive memoranda of authorities submitted by the parties, the depositions and other evidence submitted, and applicable case law. The Court concludes that the question presented is a question of law, *Sutton Drilling Co., Inc.* v. *Universal Ins. Co., supra,* 335 F.2d at 823, and that summary treatment is appropriate. The Court further concludes that on the issue of liability, plaintiff's motion for summary judgment should be, and it hereby is granted. The well in question was not "brought under control," as that term is used in the instant insurance policies and as it has been interpreted by the United States Court of Appeals for the Fifth Circuit and the Louisiana Supreme Court, until after March 1, 1970.

However on the information now available to the Court, the Court is unable to ascertain precisely which expenses incurred by plaintiff to regain control of the well were properly compensable under defendants' policies. Accordingly, appropriate affidavits will have to be submitted to resolve the damage issue.

## I. FACTS[2]

### A. *The Blowout on January 13, 1970*

Effective July 26, 1969, the defendants —Underwriters at Lloyd's London; the Institute of London Underwriters; and Travelers Indemnity Company—issued policies of insurance to plaintiff to reimburse plaintiff for risks and for expenses incurred when there occurred loss of control at the well. All policies were issued subject to terms and conditions described in detail below. *See*

---

1. The precise analysis necessary to resolve this question has been undertaken previously in only three decisions by the United States Court of Appeals for the Fifth Circuit. *Sutton Drilling Co., Inc.* v. *Universal Ins. Co.,* 335 F.2d 820 (5th Cir. 1964) ("*Sutton*"); *Fidelity-Phenix Fire Ins. Co. of N. Y.* v. *Dyer,* 220 F.2d 697 (5th Cir. 1955) ("*Dyer*"); *Georgia Home Ins. Co.* v. *Means,* 186 F.2d 783 (5th Cir. 1951) ("*Means*"); *cf. Mayronne Mud & Chem. Corp.* v. *T–W Drilling Co.,* 168 F.Supp. 800 (E.D.La.1958), *aff'd per curiam,* 272 F.2d 710 (5th Cir. 1959). The United States Court of Appeals for the Tenth Circuit is the only other Circuit court to have addressed the problem. *Equity Oil Co.* v. *National Fire Ins. Co. of Hartford,* 247 F.2d 393 (10th Cir. 1957); *Anderson-Prichard Oil Corp.* v. *Parker,* 245 F.2d 831 (10th Cir. 1957); *Feeney & Myers* v. *Empire State Ins. Co.,* 228 F.2d 770 (10th Cir. 1955); *Central Manufacturers' Mut Ins. Co.* v. *Elliott,* 177 F.2d 1011 (10th Cir. 1949).

Texas courts have been silent on this question, but the Louisiana Supreme Court has spoken, *see Creole Explorations, Inc.* v. *Underwriters at Lloyd's, London,* 245 La. 927, 161 So.2d 768 (1964) ("*Creole*"), and its analysis will be referred to where appropriate.

2. Plaintiff has recited the facts of this controversy, in the form of an affidavit of Charles Evans, one of plaintiff's employees who witnessed most of the events at the drilling site after the blowout, and who was responsible for supervising the efforts to regain control of the well. Defendants do not dispute any of these facts, only their interpretation. Accordingly, the following fact recitation is gleaned primarily from the affidavit of Mr. Evans. Where appropriate, additional references will be made to other evidence available in affidavits and depositions.

paragraph II Coverage of the Subject Insurance Policy Clauses, *infra*.

Plaintiff commenced drilling operations on Well No. C–3 in Block 24–L SE/4, State Lease 59456, in December, 1969. The well was located approximately 7 miles offshore from the Texas Coast and 20 miles southwest of Sabine Pass, Texas. Plaintiff's employees were supervising the drilling, which was being performed by Storm Drilling Company using its offshore mobile drilling rig "Stormdrill III".

Trouble began to develop at the well in the early morning hours of January 13, 1970. Drilling operations prior to this time had been conducted to a depth of 11,165 feet. While employees of the contractor attempted to remove the drilling pipe, they experienced an increase in the volume of mud returning to the surface from the bottom of the hole, indicating that gas was being circulated up the hole. The blowout preventer (BOP) was then closed around the drill pipe, and the well was put on "choke" to increase the rate of flow of drilling fluid out of the well in the "annular" space, i. e., the space in the well between the casing ($9\frac{5}{8}''$ in diameter) and the drill pipe ($5''$ in diameter).

Drilling mud and gas began blowing out of the annulus at the wellhead and, at about 5:00 a.m., January 13, 1970, the well "blew out," caught fire and burned from the annular area.[3] The fire burned for about 39 hours, until late afternoon, on January 14, 1970. During this time, the fire subsided somewhat, but continued to burn until it went out on the 14th. Subsidence of the fire was caused by the well's "bridging over", i. e., materials from the formation in which the drilling column was located

had blown into the hole and partially blocked all or part of it, restricting the flow to the surface of gas from the high pressure formation. The drill bit located at the bottom of the hole had closed that part of the hole. After 8:00 p.m., on January 14th, the fire subsided, but continued to burn from gas blowing out of the annular space at the choke manifold, the valve manually used to regulate pressure. The drill pipe was apparently completely bridged over.

### B. Commencement of Clean-Up Operations; Debris Removal

All persons present recognized the need to increase the density of mud being inserted into the well to counteract the "down-hole" pressure that was exerted upward by the gas. The wellhead and platform first had to be "cleaned up" before this counteractive operation could proceed. This cleanup included clearing off drilling platform debris, the derrick, draw works and engine house located on the drilling platform—all of which had collapsed during the fire. Such damaged equipment had to be removed to permit a new rig to be installed on the platform.

The wellhead was not approachable until January 23, 1970, because of the intense heat generated by the fire on the platform and in and around the wellhead. Between January 14 and January 23, spraying operations were conducted by a boat spraying the rig with water to reduce the extreme heat around the platform.

Gas was continuously flowing through the choke manifold on January 23, when two barges—the McDermott barge and the Brown & Root barge—arrived to be used for debris removal and well control. Fires were still occurring on board

---

3. At paragraph 11 of the instant policy coverage clauses, a "blowout" is defined as follows:

"*Blowout*"—for the purpose of this insurance shall occur when the pressure entering the well at some depth below the surface becomes greater than the pressure exerted by the column of drilling fluid in the well, either before or after applying the blowout preventors, thus causing an expulsion of the drilling fluid and/or a flow of oil, gas, air or water from the well, thereby temporarily and/or permanently preventing the normal activities connected with the hole. *See* Exhibit A, Defendants' Brief in Opposition to Motion for Summary Judgment at 1 (August 12, 1974). The parties agree that a blowout occurred on January 13, 1970.

the platform while men were placed there to commence recovery work. All work was being performed only during daylight hours, and boats continued to spray the rig.

### C. Commencement of Blowout Control Procedures

On January 27, mud began to be pumped into the hole. The BOP's were still in place and being used, and this pumping continued until February 18. The pumping procedure was designed to reduce the "down-hole pressure" which was generating gas upward, and reduction was accomplished by the following cyclical technique: (a) pump mud in; (b) bleed gas off by permitting it to escape in a controlled fashion through the choke manifold; (c) let pressure build; (d) bleed gas off; and (e) pump mud in. By applying this technique, plaintiff successfully reduced pressure at the wellhead for short periods of time, but did not another blowout. Failure to achieve completely eliminate the possibility of long-term results was caused by the "bridging over" of the drill pipe; i. e., material had been "plugged" within the well so as to prevent mud from circulating downward to counteract the upward gas pressure.

### D. Insertion of New Drilling Rig to Clean Out Underground "Bridge"

On February 8, equipment had been sufficiently positioned to permit removal of the "Stormdrill III". The rig, which had become inoperable during the initial blowout, had remained in place because of the inability of plaintiff's and the contractor's workers to perform adequately

around the platform to remove debris and simultaneously release mangled and destroyed equipment. Despite its inoperability as a drilling rig, "Stormdrill III" did serve the useful purpose of providing a platform upon which the workers could remove debris and perform other tasks from January 13 until "Stormdrill III" was removed on February 8. During this period, Storm Drilling Company personnel, who had previously been performing contracting work related to drilling the well, assisted in removing debris, tying cranes, pumping mud into the well, bleeding gas off, etc., and otherwise participated in the cleanup and attempts to regain control of the well.

On February 8, after the "Stormdrill III" had been removed, a new rig, the "Mr. Sam" of the Coral Drilling Company, was inserted into position.[4] This rig was to be utilized to locate the underground "bridge" which potentially was stifling gas beneath it from reaching the surface and was also potentially camouflaging further blowouts. The structures of the drill pipes located at the well at this time were as follows: (a) a 30″ drive pipe sunk to a depth of 290 feet below the water surface; (b) a 13⅜″ casing within this pipe, submerged to a depth of 3,534 feet and cemented to the surface; (c) a 9⅝″ casing submerged to a depth of 9,235 feet and cemented with 1000 sacks of cement; and (d) a 5″ pipe located with the 9⅝″ casing.

When the "Mr. Sam" was in position, tools including a sinker bar, a plumb bob and a measuring line were inserted into the 5″ drill pipe to locate bridges in the pipe. Once the bridge was located, a

---

4. On February 18, Mr. Evans, plaintiff's drilling supervisor at the blowout site, wrote a letter to the Railroad Commission of Texas regarding the blowout. Paragraph 3 of the letter describes operations after February 8, when Stormdrill III was removed and "Mr. Sam" was inserted, and reads as follows:

"The well has been brought under control with the blowout preventors closed and new kelly cocks installed in the drill pipe. Stormdrill III was moved off location. Coral Drilling, Inc.'s Mr. Sam was moved

on location February 8, 1970. At present we are clearing out the 5″ drill pipe at 9,243 feet. Our general plans are to clean out and cement the lower section of the hole so that it will be possible to whipstock around the cemented section and complete." Letter from Charles C. Evans, Offshore Drilling Supervisor, to Robert A. Taylor, District Director, Railroad Commission of Texas, February 18, 1970, at 1, paragraph 3. *See* n. 6, *infra.*

1¼″ drill pipe was inserted downward to "clean out" the bridge. This process was performed from February 9 until February 26. The drill pipe had to be "snubbed" downward to clean the bridge, a process by which the pipe was put down the well under pressure.

The pumping of mud into the well had to be repeated in cycles, as pressure built up in the well and was bled off. Pumping was considered to be successful over the short term if mud were continuing to circulate underground and return to the surface, as opposed to gas or other matter. On February 15, mud began to be "lost" during the pumping operation. Those persons supervising the drilling operation at the time, including two of plaintiff's senior drilling engineers and the drilling supervisor, recognized that a formation had been reached. Such a result dictated that either a pocket of gas or a hole in the drill pipe had been reached. Either phenomenon could cause mud to filter out at that depth, 9,218 feet below the surface.

On February 16, a "cement bond log", i. e., a sonic device run in a casing to indicate how much of the casing is cemented, was run to detect "bridges", or gaps, in the pipe where there was no cement, and hence, the possibility of bent or broken drill pipe. It was determined that the bridge was located at an approximate depth of 9,220 feet. A decision was made to continue to drill to attempt to break through the bridge. While cement could have been poured into the hole at this point to kill the well, or bring it completely under control by sealing it off, the decision was made not to "cement" because there was then no way to determine whether the actual formation of gas at its high pressure zone, which had caused the original blowout, had been contacted, or whether only a hole in the drill pipe had been contacted. Cementing under the latter condition would have created a very hazardous condition: enhancement of the formation of upward-bound pressure.

Also, on February 16, an "electric log" was run to determine the electrical resistivity of formation surrounding the logging tool. This device was used to determine whether the mud being lost was so lost through an open hole, or through the formation. During this time, other materials were fished out of the hole, which consisted of damaged pieces of equipment that formed part of the "bridge". The daily drilling records indicate that all during this period, the pumping operation cycle produced vacillating pressure measurements. On February 8, pressure was 2,100 lbs. upward; on February 10, 1,550 lbs.; on February 18, 2,200 lbs. The vacillations in measurement were attributable to the cyclical technique of pumping in mud, bleeding off gas pressure at the surface, etc., and the success in reducing upward pressure was short-lived. Indeed, the pressure was reduced to "0" on February 21, but had built back up to 3,000 lbs. by February 24.

### E. Performing Final Plugging Operations

Finally, on February 27, it was determined that the bottom of the casing had been reached at an approximate depth of 9,260 feet. The casing had been set to a depth of 9,234 feet. A cemented area was placed in the geological formation surrounding the casing extending upwards from the bottom of the casing for approximately 1,100 feet to fill any void that existed around the casing. The location of this cement around the outside of the casing would prevent the flow of gas under pressure from the formation beneath the bottom of the casing from traveling up the hole around the outside of the casing. Future blowouts could therefore not be prevented until cement plugs were set below the depth of 9,234 feet. Until the plugs could be set, the pressure from the gas zone, which had caused the original January 13 blowout, could continue to build up inside the annular space behind any plug set at a depth relatively

too close to the surface. A plug set "too high" could eventually rupture the casing and would fail to prevent successive blow-outs; with no cement surrounding the casing in the hole at such point, the gas pressure could flow directly up the hole, through the surface casing string and blow out again at the surface.

Therefore, the insertion of cement plugs could not be set at the appropriate depth with certainty and stability until February 27 or March 1, 1970. At the time these two plugs were set, each consisting of 250 sacks of cement, there was final assurance that future blow-outs would not occur from the source of the January 13 disruption.

## II. COVERAGE OF THE SUBJECT INSURANCE POLICY CLAUSES

In the insular world of oil and gas well-drilling insurance, determining the breadth of, and liability for, insurance coverage begins with an analysis of policy language. Paragraph 1(a) of the subject policy coverage clauses provides as follows:

This Insurance is *to cover against all risks of physical loss or damage* to platforms, drilling rigs, oil and gas well equipment, supplies and all other properties, including rented or leased equipment *for which liability has been assumed or for which the Assured is legally liable,* in use or intended for use in the offshore operations of the Assured wheresoever located or in transit worldwide.

*This Insurance is hereby extended to cover any general average and salvage charges* to which the insured property may be subject while waterborne. (Emphasis added)

Exhibit A, Defendants' Brief in Opposition to Motion for Summary Judgment at 1 (August 12, 1974). Paragraph 1 (b), entitled *"Fire Fighting and Expense of Regaining Control of Well",* provides as follows:

Notwithstanding anything to the contrary contained herein *Underwriters agree to reimburse the Assured* (subject to the deductible clause below) *for expenses incurred in extinguishing a fire which may or shall endanger* a platform or other *property insured hereunder* (including equipment on platforms) whether owned by the Assured or for which the Assured may be liable, *and also to reimburse the Assured for expense entailed by the Assured in the event of an oil or gas well getting out of control.*

It is further understood and agreed that Underwriters will reimburse the Assured for all expenses incurred in *the event the Operator is unable to bring the well under control using the equipment, materials and supplies usually maintained at the described locations, and it is necessary to purchase additional materials and supplies* and/or obtain the services of individuals, firms or corporations specializing in the control of oil or gas well blowout or fire, *including the services of directional drilling operations necessary to bring the well under control.* These provisions shall also apply to wells drilled or being drilled by drilling barges or floating drilling vessels employed under contract.

(Emphasis added)

*Id.* at 1–2. Paragraph 1(c), entitled *"Debris Removal",* provides as follows:

*This Policy is hereby extended in the event of loss recoverable* under this Policy in the absence of this clause *to pay* (subject to the deductible clause below) *the cost of removal of material and debris formerly part of the property insured hereunder,* including cost of removal or demolition of any portion of the insured property to the extent the Assured considers it impracticable to abandon the property.

(Emphasis added)

*Id.* at 2.

Under Paragraph 11, in the section entitled *"Definitions",* the term "blowout" is defined. *See* n. 3, *supra.* The terms "bringing the well under control" or "regaining control of the well" are

not defined. The policy does not specifically refer to the term "blowout" in describing an insurable event.

## III. PLAINTIFF'S DRILLING CONTRACT WITH STORM DRILLING: PROPERTY FOR WHICH PLAINTIFF IS LIABLE

The drilling contract plaintiff entered into with Storm Drilling Company for the purpose of drilling the C–3 well is also significant since the contract determines the property for which, and the extent to which, plaintiff is liable for repairs should such property be damaged by blowout. *See* Exhibit B, Defendants' Brief in Opposition to Motion for Summary Judgment (August 12, 1974). Article IV of the contract provides that plaintiff "operator" shall pay to the contractor $6,500.00 per day while operating with crews, and $6,-500.00 per day during repairs to contractor's equipment. *See* Exhibit B at 2.

In the General Provisions of the contract, there are two pertinent sections. Section 10, entitled "LOSS OF PROPERTY", provides in part as follows:

### 10. LOSS OF PROPERTY

10.1 Contractor's Rig and Surface Equipment. *Contractor shall assume all risk of loss of or damage to its rig and equipment,* including all drilling tools, machinery and appliances (including in-hole equipment when such equipment is out of the hole) regardless of when or how such destruction for damage occurs.

10.2 Contractor's In-Hole Equipment. *Operator shall assume all risk of loss of or damage to Contractor's in-hole equipment* when such equipment is in the hole, regardless of when or how such destruction or damage occurs.

10.3 The Hole. Except as provided in Section 10.4, *Operator shall assume all risk of loss of damage to the hole* regardless of when or how such destruction or damage occurs.

10.4 Operator's Platform and Equipment. *Operator shall assume all risk of loss of or damage to Operator's wells, platforms and equipment;* except, however, that where such loss or damage is incidental to Contractor's moving in or moving out or rigging up or rigging down operation, Contractor shall assume such risk, without regard as to how such damage occurs.

(Emphasis added)

Section 14, entitled "FORCE MAJEURE", provides as follows:

### 14. FORCE MAJEURE

14.1 Force Majeure and Performance. *If a blowout,* hurricane, accident, injunction, government order, or other force majeure beyond the control of either party *prevents the performance of the obligations of either party or if the equipment of Contractor or of Operator is damaged to the extent that repairs within a reasonable time will be impracticable, or is destroyed,* as the case may be, *this agreement may be terminated at the option of either party;* provided, however, if the termination is occasioned by destruction of Operator's equipment, and if Contractor's equipment is in condition to operate, Operator shall pay to Contractor whatever payment, if any, is required by the other provisions hereof to permit Operator to cancel the agreement. *The cost of moving Contractor's equipment that is damaged or destroyed by a force majeure shall be paid by Contractor and it shall promptly remove such equipment from Operator's base. Each party shall exercise reasonable diligence to correct any force majeure which is delaying the work hereunder* with the understanding that this shall not obligate either to settle any labor dispute or comply with governmental orders or decrees, where settlement or compliance is deemed to be disadvantageous to the affected party. Except as may be provided to the contrary in

that portion of this agreement providing for rates to be paid to Contractor, neither Operator nor Contractor shall be responsible or liable to the other for a force majeure as herein defined. (Emphasis added)

## IV. THE MEANING OF "BRINGING THE WELL UNDER CONTROL"

In this case, the language of the instant policy clauses, the interpretation of any ambiguous portions therein and previous interpretations of analogous policy language by the United States Court of Appeals for the Fifth Circuit, each independently support plaintiff's contention that the instant well was not brought under control until March 1, 1970.

### A. Impact of Policy Language

Defendants admit that a blowout occurred on January 13, 1970. Defendants further admit that between January 13 and March 1, all of the procedures utilized by plaintiff and others working at the drill site were proper, reasonable and guaranteed to resolve the underground pressure problems as soon as possible. See Deposition of John C. O'Connor, Jr., at 44, lines 21–23, and at 45, lines 9–11 (July 25, 1974). Credible evidence further indicates that normal activities could not have been conducted while the blown-out well was dormant during the time down-hole pressure was "bridged over" or "bled off". See Deposition of O'Connor, supra, at 26–27, lines 1, 20–23 and 25, and at 35, lines 1–4.

One characteristic of a blowout, as defined in paragraph 11, is the "temporary and/or permanent prevention of conducting of normal activities connected with the hole". Normal activities connected with the drilling hole could not be resumed and were not conducted prior to March 1, 1970. Therefore, defendants should be liable for appropriate expenses incurred to that date. The first section of paragraph 1(b), quoted

above, see page 713, supra, concludes with the phrase

and also to reimburse the Assured for expense entailed by the Assured in the event of an oil or gas well getting out of control.

The appropriate expenses entailed by the Assured when the well got out of control between January 13 and March 1, 1970, would be reimbursable under this clause.

### B. Impact of Ambiguities in Policy Language

The plain meaning of paragraphs 1(b) and 11 can be utilized to resolve in plaintiff's favor the controversy of appropriate liability under the policy. However, the Court recognizes certain complications in applying this straightforward analysis. Ambiguities are present in certain sections of the coverage clauses which militate against using their "plain meaning".

The paragraph 11 definition of "blowout" is unambiguous, and the paragraph 1(b) discussion of fire fighting and "regaining control of the well" is unambiguous. However, the interaction of these two sections creates acute problems in interpretation.

For example, the term "well getting out of control", utilized in § 1 of paragraph 1(b), and "bring the well under control", utilized in § 2 of paragraph 1(b), are not defined. The term "blowout" is defined but is not mentioned in paragraph 1(b), which describes insurable events. In paragraph 1(a), defendants agree to reimburse plaintiff for all risks of physical loss or damage to property for which plaintiff is liable including salvage. In § 2 of paragraph 1(b), defendants agree to reimburse plaintiff for all expenses incurred in regaining control of the well which are purchased and/or utilized specially for that purpose, including "the services of directional drilling operations necessary to bring the well under control."

Defendants' contentions make it clear that defendants intended, or at least now

seek to construe, the phrase "regaining control of the well" differently from the term "blowout". Section 1 of paragraph 1(b) discusses only fire fighting by its terms, but § 2 implies that both fire fighting and blowouts are covered by paragraph 1(b). It is axiomatic in an oil and gas well drilling environment that blowouts are a primary cause of fires and of a drilling operator's losing control of a well. Indeed, there can be no other reason for defining blowout than to relate such a concept to policy coverage of lost control. The Court therefore concludes that paragraph 1(b) was intended to include coverage of losses caused by blowouts.

A blowout admittedly occurred. Defendants are willing to compensate plaintiff for losses caused by the blowout, but attempt to curtail coverage by imposing a restrictive definition of the term "out of control", and by contending that regaining control is all that is compensated under the policy, not damage and expenses incurred in combatting a blowout—which by policy definition endures for so long as normal activities cannot be conducted at the hole.

■ In interpreting the ambiguities which are possibly present, this Court would normally construe such language contrarily to the defendants' suggested result. Under Texas law applicable to interpreting ambiguous insurance policy clauses, this Court is bound to construe these ambiguities adversely to defendants. Where an ambiguity exists in an insurance contract, the contract will be construed most strongly against the insurers. And once the ambiguity exists, the insured, to recover, needs only to offer a reasonable interpretation of the language in question. *Continental Cas. Co. v. Warren,* 152 Tex. 164, 254 S.W.2d 762 (Tex.1953), *quoted in Gideon v. Service Life & Cas. Insur. Co.,* 510 S.W.2d 631, 632 (Tex.Civ.App.—Corpus Christi 1974, *no writ); see Snyder National Bank v. Westchester Fire Ins. Co.,* 425 F.2d 849, 852 (5th Cir. 1970).

■ Plaintiff suggests as its reasonable construction that risk of loss due to blowout is insured and that the insurers should be liable for all expenses incurred by plaintiff (above the deductible) in preventing recurrent blowouts at the well head and permitting normal activities to be resumed there. The Court agrees with this construction. Indeed, considering the nature of, and extreme hazard presented by, blowouts, and the relatedness within policy coverage of the concepts of "blowout" and "regaining control of the well", such a construction is not only reasonable in light of policy ambiguities, but also the only plausible construction which can be made.

Therefore, a well is not brought under control within the meaning of this insurance coverage merely when "blowout-fed" fires expire. The fortuitous occurrence of a "down-hole bridging over" of pressure does not relieve a drilling operator of the responsibility to continue to counteract potential hazards which may flare at any time and does not permit the operator to resume normal activities immediately. Had plaintiff and the agents assisting plaintiff between January 13 and March 1 merely reinstated normal safety procedures once the fire went out, prevailing conditions at the well would have caused repeated blowouts. As defined and utilized in the coverage clauses, the concept of continually building down-hole pressure creating a constant threat of the expulsion of drilling fluid and a flow of gas from the well represents a well "out of control," because normal activities cannot be performed at the wellhead until such conditions are finally eliminated.

*C. Impact of Applicable Law of the United States Court of Appeals for the Fifth Circuit*

While previous decisions of the United States Court of Appeals for the Fifth Circuit, *see* note 1, *supra,* have turned on

particular policy language being litigated in each case, certain general oil and gas well insurance priniciples have evolved. These principles are well-articulated in the *Sutton* case, *supra,* 335 F.2d 820.

The analysis of the Court of Appeals makes the first of these principles clear: the terms "out of control" and "blowout" are terms of art, the definition of which raises questions of law. 335 F.2d at 823. In *Sutton,* trial was had to the jury. The jury found, in answer to special interrogatories, that expulsion of drilling fluid and gas erupting from within the well was not "uncontrollable," that the well did not get completely "out of control," and that the expulsion was not sudden. On this basis, the trial court determined that no blowout had occurred, and that no situation had been created that constituted a complete "loss of control" of the well.

Confronted with this jury finding, the Court of Appeals reversed. Judge Brown initiated his analysis of the proper definition and application of the insurance policy by noting, as indicated above, that construction of the policy definition and policy application was a matter of law. *Id.* The Court then explained, at page 824, that a reasonable interpretation of the term "control" had to reflect the state of the art and the realities of regaining the use of blown-out wells. Thus, the Court distinguished between "control" from a sheer physical point of view—in the sense that gas pressures are harnessed by capping— and "control" from the practical point of view—in terms of steps capable of being taken to subdue gas pressure, but which would still permit the operators to make the well as planned.

Adopting this latter definition of "control", the Court went on to state that as long as the blow-out preventor was closed, control was not established. 335 F.2d at 824. "Control" was being

exerted in the sense that closing the BOP prevented immediate expulsion and kept continuous surface hydrostatic pressure on the drill pipe to counteract down-hole pressure. "But so long as the BOP was closed, it was impossible to 'continue to make the well'." *Id.* Indeed, under the *Sutton* facts (and the instant facts), any momentary opening of the BOP prior to plugging the hole would have resulted in release of pressure built up from the underground gas seeking escape. The appellate court concluded on these facts that the inability to cement off both drill pipe and annulus made it impossible to "continue to make the well" or "to control the well". *See generally,* Note, 21 Oil & Gas Rev. 372 (1965); Greathouse, *Uses and Requirements for Insurance in Oil and Gas Transactions,* 8th Oil & Gas Inst. 87, 113 (Southwest Legal Foundation 1957).

Each oil and gas insurance case presents special circumstances. Policy language must control in the first instance. *Compare Fidelity-Phenix Fire Ins. Co. of N. Y. v. Dyer, supra,* 220 F.2d at 698 nn. 2 & 3 *with Georgia Home Ins. Co. v. Means, supra,* 186 F.2d at 784 n. 2. Yet, despite policy language differences, the United States Court of Appeals for the Fifth Circuit has consistently held that when down-hole pressures continue to be greater than pressures exerted by the heavy column of drilling fluid forced down into the well, the well is not "under control". *See Sutton, supra,* 335 F.2d at 823–24; *Dyer, supra,* 220 F.2d at 700; *Means, supra,* 186 F.2d at 786.[5]

■ Extrapolating the appellate court's analytical approach of *Sutton, Dyer* and *Means* to the instant case, this Court concludes that as a matter of law, the well was not under control until March 1, 1970. The possibility of a blowout was imminent until that time, during which pressure was continually

5. Courts of other jurisdictions concur in this definition of "control". *See Central Manufacturers' Mut. Ins. Co. v. Elliott,* 177 F.2d 1011, 1012 (10th Cir. 1949); *Creole Explorations, Inc. v. Underwriters at Lloyd's, London,* 245 La. 927, 161 So.2d 768, 771 (1964).

building up. The well could not be made prior to March 1, 1970. That a "blownout" well *is not blowing wild does not* mean that the well is under control. Therefore, summary judgment on the issue of liability is granted in favor of plaintiff.[6]

## V. COMPENSABLE DAMAGES UNDER THE POLICY

For any of three separate and independent reasons, defendants are liable to compensate plaintiff under the instant coverage for appropriate expenses incurred in bringing the well under control from January 13 until March 1, 1970. On the evidence now available to the Court, however, determining the total appropriate expenses incurred is not possible.

Plaintiff contends, without elaboration and without any supporting documentation, that expenses incurred in combatting the subject blowout totalled $1,262,613.19. Plaintiff therefore seeks to recover this amount, less the $1,000,-000.00 deductible applicable under the policy.

Defendants deny coverage for this total damage figure and challenge the propriety of claiming three particular expenses: (1) $148,906 paid to McDermott for employment of its barge to assist in debris removal; (2) $364,450 to Brown & Root for employment of its barge to assist in debris removal and removal of Stormdrill III; and (3) $171,031 to Storm Drilling Company for the services of its employees who assisted plaintiff in performing cleanup and well control operations at the wellhead until February 8, 1970, at the rate of $6,500 per day.

■ An insured's claimed expenses should be carefully scrutinized. To determine which of plaintiff's expenses in the instant case are properly compensable, the Court here delineates certain guidelines founded upon the pragmatic approach utilized by the Fifth Circuit in *Sutton, Means* and *Dyer* in defining "control" and "blowouts": (1) the expenses incurred for fishing and whipstocking are reasonably related to bringing the well under control; (2) expenses incurred for employing available workers to assist in removing debris and preparing the wellhead for "control" operations are reasonably related to bringing the well under control;[7] (3)

---

6. Defendants attach significance to the letter of Evans, plaintiff's on-site drilling supervisor, to the Railroad Commission on February 18, 1970, in which Evans states that "the well has been brought under control". *See* note 4, *supra*. Defendants contend that this statement amounts to an admission that the well was under control for purposes of the subject insurance policy. *See* Defendants' Brief in Opposition to Motion for Summary Judgment at 5 (August 12, 1974).

This Court does not agree. In *Sutton, Dyer* and *Means*, the Court of Appeals makes clear that the concept of a well "being under control" is a legal concept determined by application of certain technical oil and gas drilling principles and certain principles of insurance interpretation. Therefore, Evans' statement regarding control is of no more moment than defendants' contention that the well was "under control" when the fire went out on January 14. The absence of a definition of "control" in the policy dictated that there would have to be a judicial resolution of this question once the insurers and insured could not agree on a definition. Under

the instant circumstances, "control" has a *legal definition which has been rendered by* the United States Court of Appeals for the Fifth Circuit.

7. *Defendants challenge as non-compensable* under the coverage the entire expense plaintiff incurred to Storm Drilling Company, contending that under the drilling contract, *see* paragraph III at pages 714–715, *supra,* plaintiff could have exercised its option under section 14 ("Force Majeure"), *see* page 714, *supra,* and freed itself of any liability for the normal $6,500 per day fee charged by Storm Drilling Company for subcontracting operations.

The "force majeure" clause was optional, and neither party was obligated to terminate, nor did the contract require termination, when a blowout occurred. From all available information, the Court concludes that it was reasonable and necessary for plaintiff to continue to employ Storm Drilling workers to assist in clearing the platform and "bleeding" the well. However, the Court cannot determine without analyzing the itemized

use of a drilling rig to drill through the 9,200-foot deep bridge is a reasonable expense—therefore, the expense of installing this rig and of removing the damaged "Stormdrill III" are reasonably related to bringing the well under control; (4) debris removal was a necessary expense in this case to permit plaintiff and its workers to begin clearing out the well to commence drilling, and is reasonably related to bringing the well under control.[8] Paragraph 1(c), page 713, *supra*.

With regard to damaged equipment and to the $6,500 per day paid to Storm Drilling Company, the Court concludes that recovering these expenses is dictated by the limitations of the policy. Paragraph 1(a) makes clear that defendants shall only be liable for damages to that property for which plaintiff is liable. According to the drilling contract between plaintiff and Storm Drilling, plaintiff was liable for damage to Storm Drilling equipment which was "in-hole" at the time of the blowout and was liable for damage to it wells, platforms and equipment. Storm Drilling was liable for loss or damage to its rig and equipment that was not "in-hole". Thus, an itemized statement of invoices and damage reports should reveal which property damage is insurable.

The Court cannot resolve the total expense figure compensable under the policy without additional information. Accordingly, plaintiff is directed to submit within twenty (20) days a detailed listing of all expenses generated during the time from January 13, 1970, to March 1, 1970, including copies of invoices and other business documents where appropriate. Plaintiff should also submit a memorandum of authori-

ties supporting the insurability of each expense. Defendants are directed to submit a response to this itemized account and memorandum within ten (10) days thereafter.

---

listing whether all of the activity engaged in by Storm Drilling's employees was related to bringing the well under control, and therefore cannot determine at this time whether all fees paid to Storm Drilling should be compensable.

8. The Court recognizes that the above view of compensable expenses was not the one

adopted by the Louisiana Supreme Court in the *Creole* case. *See Creole Explorations, Inc. v. Underwriters at Lloyd's London, supra,* 161 So.2d at 771–75. However, the Court concludes that the *Creole* guidelines are too restrictive when considered against the pragmatic analytical approach utilized by the Fifth Circuit in *Sutton, Dyer* and *Means.*